Julia LANGE–KESSLER; Nancy Quaglia; Susan Snyder; Nancy LaChance, Plaintiffs–Appellants,

v.

DEPARTMENT OF EDUCATION OF THE STATE OF NEW YORK; Dr. Mark Chassin, as Commissioner of the New York State Department of Health, Defendants–Appellees.

No. 594, Docket 96–7632.

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1996.

Decided March 26, 1997.

Michael H. Sussman, Goshen, NY (Stephen Bergstein, Sussman, Bergstein, Wotorson and Whateley, Goshen, NY, of counsel), for Plaintiffs–Appellants.

Daniel Smirlock, Assistant Attorney General, Albany, NY (Dennis C. Vacco, Attorney General of the State of New York, Peter H. Schiff, Deputy Solicitor General, Nancy A. Spiegel, Assistant Attorney General, Albany, NY, of counsel), for Defendants–Appellees.

Before: FEINBERG, LEVAL and PARKER, Circuit Judges.

PARKER, Circuit Judge.

Appellants Julia Lange–Kessler, Nancy Quaglia, Susan Snyder, and Nancy LaChance appeal from the judgment of the United

States District Court for the Northern District of New York (Thomas J. McAvoy, *Judge* ), granting summary judgment in favor of the New York State Department of Education [1] (the "SED") and Dr. Mark Chassin.[2] This action presents a substantive due process challenge to the Professional Midwifery Practice Act (the "PMPA"), N.Y.Educ. Law §§ 6950–6958 (McKinney Supp.1996). There are principally two issues on appeal: (1) whether the district court erred when it determined that the PMPA is rationally related to a legitimate state interest; and (2) whether the district court erred when it determined that the right to privacy does not encompass the right to choose a direct-entry midwife to assist with childbirth. We affirm the district court on both issues.

## I.  BACKGROUND

The PMPA provides that "[o]nly a person licensed or exempt under this article or authorized by any other section of law shall practice midwifery." N.Y.Educ.Law § 6952.[3] Appellants challenge two provisions of the PMPA. First, appellants challenge the requirement that midwifery must be practiced in accordance with a written practice agreement between the midwife and (1) a board certified obstetrician-gynecologist; (2) a licensed physician who practices obstetrics; or (3) a hospital that provides obstetric services. *See id.* § 6951.1. Second, appellants challenge the requirement that all applicants for a professional license:

(a) complete educational preparation (degree or diploma granting) for the practice of nursing, followed by or concurrently with educational preparation for the practice of midwifery in accordance with the commissioner's regulations, or

(b) submit evidence of license or certification, the educational preparation for which is determined by the department to be equivalent to the foregoing, ... or

(c) complete a program determined by the department to be equivalent to the foregoing and in accordance with the commissioner's regulations.

*Id.* § 6955.2.

Appellant Lange–Kessler is a direct-entry midwife. A direct-entry midwife trains through an apprenticeship with other midwives, rather than through formal education. Therefore, Lange–Kessler may not become licensed under the PMPA. She asserts that the PMPA has deprived her of the ability to earn a living in her chosen profession, in violation of the Fourteenth Amendment to the United States Constitution, by effectively "preclud[ing] the legal practice by direct entry midwives in the State of New York." (Compl. at 1.)

Appellants Quaglia, Snyder, and LaChance are women of childbearing age who in the past have used the home-birthing services of Lange–Kessler and who wish to use her services in future pregnancies. They assert that the PMPA has violated their right to privacy under the First and Fourteenth Amendments by restricting their right "to choose a birthing style and a qualified attendant of their choice." (Compl. at 8, ¶ 46.)

In support of its motion for summary judgment, the SED submitted one affidavit from Mary Applegate, M.D., M.P.H. Since 1993, Dr. Applegate has been the Medical Director for Reproductive and Perinatal Health at the New York State Department of Health ("DOH"), Division of Family and Local Health. In her capacity as Medical Director, Dr. Applegate has been responsible for re-

---

1.  This action originally was brought against the New York State Department of Health and Dr. Mark Chassin as Commissioner of the New York State Department of Health. The district court granted appellants' motion to amend the complaint to substitute the New York State Department of Education in place of the Department of Health.

2.  Appellants do not appeal the district court's grant of summary judgment in favor of Dr. Mark Chassin, the Commissioner of the New York State Department of Health.

3.  The PMPA defines the practice of midwifery as:

the management of normal pregnancies, child birth and postpartum care as well as primary preventive reproductive health care of essentially healthy women as specified in the written practice agreement, and shall include newborn evaluation, resuscitation and referral for infants.

N.Y.Educ.Law § 6951.1.

viewing the credentials and practice arrangements of nurse-midwives applying for practice in New York State.[4] In her affidavit, Dr. Applegate describes the physical complications that may arise during pregnancy and childbirth. She also asserts that direct-entry midwives are not qualified to handle these complications.

In response to appellees' summary judgment motion, appellants filed approximately twenty-eight affidavits coming from "consumers" of direct-entry midwives' services, from direct-entry midwives, from licensed nurse-midwives, and from physicians. Collectively, those affidavits contend that home births supervised by direct-entry midwives are just as safe as births performed by doctors or nurse-midwives. In addition, the affidavits of the licensed nurse-midwives assert that licensed obstetricians refuse to enter into practice agreements with them, thus precluding the midwives from performing home births.

## II. DISCUSSION

### A. Standard of Review

This Court reviews the district court's grant of summary judgment de novo. See Catlin v. Sobol, 93 F.3d 1112, 1116 (2d Cir. 1996).

### B. Rational Basis

■ The right to follow a chosen profession is a property interest protected by the Fifth and Fourteenth Amendments. See Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959); Schware v. Board of Bar Exam'rs, 353 U.S. 232, 238–39, 77 S.Ct. 752, 755–56, 1 L.Ed.2d 796 (1957). State-imposed restrictions on this right must be rationally related to a legitimate state interest. Schware, 353 U.S. at 239, 77 S.Ct. at 756; Williamson v. Lee Optical, Inc., 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955).

■ A statute regulating a profession is presumed to have a rational basis unless the plaintiff shows that "the legislative facts upon which the [statute] is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." Vance v. Bradley, 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979). To defeat this challenge, the state is not required to come forth with empirical evidence tending to show that the facts underlying the restrictions are true. See id. at 110–11, 99 S.Ct. at 949–50. Rather, a statute withstands a substantive due process challenge if it "might be thought" that enacting the statute was a rational way to further a legitimate interest. See Williamson, 348 U.S. at 488, 75 S.Ct. at 464.

In the instant case, the state has identified an interest in protecting the health and welfare of mothers and infants. In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court specifically categorized those same interests as "important and legitimate" ones. See id. at 162–63, 93 S.Ct. at 731–32. Therefore, as long as the restrictions that the PMPA places on the practice of midwifery are rationally related to protecting the health and welfare of mothers and infants, those restrictions must be upheld. Put another way, the relevant question is whether the legislature might have thought that an applicant with (1) a formal education and (2) a written practice agreement with a licensed physician or hospital is more fit to practice midwifery than is an applicant without these qualifications. See, e.g., Schware, 353 U.S. at 239, 77 S.Ct. at 756 ("[A]ny [required] qualification must have a rational connection with the applicant's fitness or capacity to practice [the profession]."); Chalfy v. Turoff, 804 F.2d 20, 23 (2d Cir.1986) ("[A] licensing authority need only show that the challenged requirement is ra-

---

4. In addition, Dr. Applegate serves on a number of departmental and interdepartmental committees dealing with various public policy issues, including midwifery and rural birthing services. Dr. Applegate is also an Assistant Director of the DOH's Preventive Medicine Residency Program, as well as an Assistant Professor of Health Policy and Management at the State University of New York at Albany School of Public Health. From 1992 to 1995, Dr. Applegate served on a task force examining the quality of obstetric and gynecological care, which was jointly sponsored by the New York chapter of the American College of Obstetricians and Gynecologists, DOH, and the Healthcare Association of New York. From 1986 to 1987, she was a childbirth educator at Harrisburg Hospital in Harrisburg, Pennsylvania.

tionally related to an applicant's fitness for the occupation.").

■ This question must be answered in the affirmative. The affidavit of Dr. Applegate describes two conditions that may arise during pregnancy: pregnancy-induced hypertension and gestational diabetes mellitus. According to Dr. Applegate, if left untreated, these conditions may result in the death of mother and fetus. In addition, Dr. Applegate describes several potentially fatal complications that may arise during the birthing process, including fetal distress, failure to progress, postpartum hemorrhaging, and ruptured uterus. Appellants do not contest that these conditions may threaten the life of mother and infant; in fact, many of the affidavits submitted by appellants confirm the serious nature of these complications.

■ In light of these risks, the legislature could reasonably have believed that midwives who have completed a nursing program, and who are affiliated with a medical professional, are more fit than direct-entry midwives to practice midwifery. *See Sammon v. New Jersey Bd. of Medical Examiners*, 66 F.3d 639, 646 (3d Cir.1995). Moreover, insuring the fitness of midwives is rationally related to the state's legitimate interest in protecting the health and welfare of mothers and infants.[5] *See id.*

Appellants argue, however, that genuine issues of material fact exist as to whether direct-entry midwives are less capable than other professionals of diagnosing and treating the various complications associated with pregnancy and childbirth. For example, they argue that because their own experts contested Dr. Applegate's assertions that direct-entry midwives exhibit "poor judgment" while attending home births, "summary judgment was improper as the district court could not conclude, as a matter of law, that the state legislature could reasonably rely on the facts asserted in her affidavit."

Appellants' argument, in and of itself, demonstrates the futility of appellants' constitutional challenge: If reasonable minds could differ on the issue of a direct-entry midwife's competence, then it is wholly conceivable that

the legislature took the view that direct-entry midwives are not likely to be sufficiently competent. *See Vance*, 440 U.S. at 112, 99 S.Ct. at 950.

Accordingly, we affirm the district court on this issue.

## C. *Right to Privacy*

In *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court established that the Constitution guarantees the fundamental right to privacy. Since that time, the right to privacy has been interpreted to protect freedom of choice in certain matters related to childbearing. *See, e.g., Carey v. Population Servs. Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (purchase of contraceptives); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (abortion); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (use of contraceptives).

■ Whenever it is determined that legislation significantly interferes with the exercise of a fundamental right, a court must review the legislation with strict judicial scrutiny. *See, e.g., Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Skinner v. State of Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Under this heightened standard of review, the state must demonstrate that the statute serves a compelling state interest and that the state's objectives could not be achieved by any less restrictive measures. *See Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972) (citing cases).

■ We are unable to conclude, however, that the PMPA significantly interferes with the exercise of a fundamental right. In the abortion context, the Supreme Court has not interpreted the right to privacy so broadly that it encompasses the right to choose a particular healthcare provider. *See Connecticut v. Menillo*, 423 U.S. 9, 11, 96 S.Ct. 170,

---

5. We note that the SED was not required to submit "empirical proof" of the facts underlying the PMPA. *See Vance*, 440 U.S. at 110, 99 S.Ct.

at 949. Nonetheless, when such evidence is offered, we may consider it in our decision of whether to uphold a challenged statute. *See id.*

171, 46 L.Ed.2d 152 (1975) (per curiam) (holding that the state may require abortions to be performed by licensed physicians). Relying in part on *Menillo*, the Third Circuit held that the right to privacy does not cover "the interest of parents in selecting a midwife of their choice." *Sammon*, 66 F.3d at 644–45; *accord Bowland v. Municipal Court*, 18 Cal.3d 479, 495, 134 Cal.Rptr. 630, 638, 556 P.2d 1081, 1089 (1976) (en banc); *People v. Rosburg*, 805 P.2d 432, 437 (Colo.1991) (en banc); *Hunter v. State of Maryland*, 110 Md.App. 144, 160, 676 A.2d 968, 975 (Md.Ct. Spec.App.1996); *Leigh v. Board of Registration in Nursing*, 399 Mass. 558, 562, 506 N.E.2d 91, 94 (1987). In accordance with these decisions, we hold that the right to privacy does not encompass the right to choose a direct-entry midwife to assist with childbirth.

Therefore, the appropriate standard of review is whether the challenged provisions bear a rational relationship to a legitimate state purpose. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973); *Sammon*, 66 F.3d at 645. As we concluded in the previous section, insuring the fitness of midwives is rationally related to the state's legitimate interest in protecting the health and welfare of mothers and infants. Therefore, we affirm the district court on this issue.

In addition to their primary arguments, appellants also argue here that by disqualifying direct-entry midwives, the PMPA effectively prohibits women from ever choosing a home birth. They contend that certified physicians and nurse-midwives refuse to attend home births due to peer pressure and insurance concerns. Thus, appellants seek to assert not only an alleged fundamental right to choose a qualified direct-entry midwife, but also a fundamental right to choose the location of birth. Although the district court did not address this argument,[6] we exercise our discretion to do so here. *See Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Chertkova v.*

*Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 88 (2d Cir.1996).

■ Even if the alleged fundamental right to choose a home birth exists, appellants have not alleged that they ever sought much less were unable to find a licensed nurse-midwife or physician to perform a home birth, nor do the affidavits that appellants submitted support this contention. Because appellants have submitted no evidence to support the contention that the PMPA substantially interferes with the exercise of the alleged right to have a home birth, summary judgment is properly granted to appellees on this claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### III. CONCLUSION

Because the right to privacy does not encompass the right to choose a direct-entry midwife to assist with childbirth, the PMPA need only be rationally related to a legitimate state interest. Insuring that midwives will be qualified to handle the medical risks associated with pregnancy and childbirth is rationally related to the state's legitimate interest in protecting the health and welfare of mothers and infants. Therefore, the decision of the district court is affirmed.

---

6. The issue was pled below and referred to briefly in response to the motion for summary judgment. However, there was no factual development whatsoever and very little legal argument, probably explaining the district court's inaction.